This day the Court delivered the following opinions:
Tilghman C. J.
The paper exhibited as the will of Jacob Arndt, is of his own hand writing ; it disposes of his whole estate, and appoints executors. So that proof being made of the hand writing by two witnesses, it would be a perfect will by the law of Pennsylvania. This is a very strong circumstance in the case, and one that distinguishes it from most that have occurred. I think too, that there can be no doubt, but it contained the whole substance of what he intended for his will. It ought, therefore, to be supported, if it can be done without violating the law. The hand writing of the testator has been proved. What then prevents it from being established as his will ? It is not his will, say its opponents, because, from the evidence it appears that the animus testandi was wanting. This is resting the cause on its true point. There is no difficulty in the law. All the cases that have been, or can be cited, will be narrowed at last to this simple question. Does it appear from the evidence, that the testator intended the contents of this writing for his last will ? Being on its face a complete will, it lies on those who object to it to show in what it is deficient. The testimony of Mr. Traill is relied on. Arndt carried the paper to him, and requested him to put it into form, saying that it contained a memorandum of his -will. Traill read it over, inserted the name of Elizabeth in the devise to the wife, (an addition proper, but not at all necessary) desired him to leave the paper, and told him that he would consider on it. In about two weeks, Arndt called again, Traill told him “ he had examined the paper and had “found something in it rather inconsistentf 'pointed out the inconsistencies between the 5th and 6th clauses, and advised him to apply to Mr. Sitgreaves for assistance, as he (Traill) did not clearly understand the subject. Arndt then looked over the paper, said it was as Traill had told him, and that he believed, he would go to Mr. Sitgreaves, who on a former *264 occasion had offered him his services. This is all that Traill "knows of the matter. Arndt lived about five months after this conversation, which took place in June, 1812. It does not appear that he ever spoke to Mr. Sitgreaves on the subject of his will. When he died, this paper was in his possession, and also a will drawn in the year 1803, by Traill (from written notes furnished by the testator), signed by him, and regularly executed in the presence of two subscribing witnesses. The circumstance of his keeping the prior will uncancelled, is relied on to prove, that he meant that to stand for his will, until the latter should be reduced to form and executed. It certainly is a circumstance deserving of consideration. But it is outweighed by stronger circumstances. It will appear on an examination of the two writings, that the mind of Arndt had undergone a great change with regard to two of his brothers and their families. Add to this, that having acquired the most valuable part of his real estate subsequent to the making of the will of 1803, if that is to stand for his will, he died intestate as to all the after purchased property, which is contrary to his intention, because, by both wills he disposed of the whole of his estate. Considering all circumstances then, I should conclude that he retained the written memorandum now exhibited, intending it to stand as his will, in case he should die without reducing it to more perfect form; unless it appears, that the inconsistencies pointed out by Traill were such as to involve a contradiction, or tend to some absurdity. The inconsistency is this, In the 5th clause, he authorises his executors to sell certain houses and lots after the death of his wife and his brother Abraham. In the 6th clause, he gives his wife liberty, after the sale made, in her life time to make a will, and will to whom she pleases, one-half of the estate which was not before bequeathed. The houses and lots are not to be sold till after her death, yet during her life, and after the sale, she is to make a will. The inconsistency is not material. The mode of expression is awkward, but no one can doubt of the meaning, which is, that she may make a will, and thereby dispose of one-half of certain property, including the proceeds of sale of certain houses and lots which are not to be sold till after her death. It has been remarked also, that the 5th clause is not consistent with itself. It directs the three executors to sell and convey certain property, which is not to be sold till after the death of two of them. *265 (the wife of Arndt and his brother Abrahani). This is true. But the surviving executor will have power to sell, so that the will would not be defeated.
It does not appear, however, that this last objection was pointed out by Traill, or had any influence on the mind of Arndt. So that after all, he kept in his possession, to the time of his death, a writing called a memorandum, purporting to dispose of all his property, and effectual for that purpose both in form and substance. That he himself supposed it to be effectual, (although he might intend to give it better form and more solemnity), there is strong reason to conclude, from his doing nothing further in the course of five months, and if he did suppose it to be effectual, nothing more is wanting; that supposition is itself the animus testandi. I am, therefore, of opinion, that the decree of the Register’s Court should be reversed, and the paper in question, received and established as the last will and testament of Jacob Arndt.
Ye ates J.
If the written memorandum of Jacob Arndt, drawn up by himself, (in all probability in 1812,) had stood on the proof by two witnesses, that it was in his own hand writing, independently of the conversations had with Robert Traill respecting it, I have no doubt, that it would have operated as a valid will. It had all the solemnities required by our law, and containing dispositions of his property, real and personal, inconsistent with his former will, of March 6th, 1803, necessarily revoked the same, as both could not stand together.
It has been contended on the part of the appellants, that these conversations can have no influence on our decision; but I cannot accede thereto. The true question in this case must be, whether the disputed paper, was in truth designed by Arndt, as his last will, containing a disposition of his property to take effect after his death ? We are told in the books, there must be the animus testandi, a firm resolution and advised determination to make a will% The mind and intention are every thing, the manner nothing. (Roberts on Wills, 201.) The mind and intention of a man are to be collected, not only from what he does, but what he says. Acts in themselves may be equivocal, and therefore subject to explanation from attendant circumstances, and declarations of the party. And hence, parol evidence has been admitted to show, whether *266 the deceased by cancelling a subsequent will, meant to revive a former one, or to die intestate. Boudinot et al. v. Bradford, 2 Dall. 266, Lawson v. Morrison et al. Ib. 286.
It has also been contended, that as the instrument of 1812 carries upon the face of it no evidence of an intention to perfect it by some further solemnity, it shall be deemed to be the will of Arndt, and that extrinsic evidence cannot be received against it. I admit, that this distinction seems to have taken place in the later determinations, at Doctors’ Commons, (according to Roberts on Wills, 198); but I can find no such discrimination in the English cases previous to the American revolution. The remarks I have already made are applicable to this objection. Was it the settled resolve of the testator’s mind, that the instrument in question should be a substitute for his will of 1803, formally executed in the presence of subscribing witnesses ? If several witnesses of undoubted credit, had sworn, that after Arndt had thus drawn up the paper, he had declared, that he meant it only as rough notes for his counsel to draw his will, and that his former will was considered by him to be in force, until such new will was formally executed, I think little doubt could be entertained, that this was not his will: the animus testandi would be wanting, which alone could give it life and vigour.
Having thus disposed of these two points, to my own satisfaction at least, I proceed to consider the effect of Mr. Traill’s testimony, from which no doubt others may draw different conclusions.
The testator brought to him the paper, which he said was a memorandum of.his last will and testament, and requested him to put it into form. He looked over it,, and it was left with him for consideration. About a fortnight afterwards, Arndt called again, when an inconsistency waspointed out to him in a certain part of the paper, and he was advised to apply to some other person, as Traill did not clearly understand it' — Mr. Sitgreaves was named — -Arndt looked o.ver the paper, and said it was as Traill had told him, .and believed he would go to Mr. Sitgreaves. He thanked Mr. Traill and left him* and he continued of sound mind and. memory until the day preceding his death, which took.place between four and five months afterwards. , • .. .
The inconsistency pointed out by Mr. Traill, is evident on inspection of the will»- . .In the 5th. item,..it is,.directed, that *267 after the death of the testator’s wife, and his brother Abraham, his executors should sell two certain houses, &c. The next item provides, that after the sale so made, his wife should have the power of devising one-half of the estate not before bequeathed, &c. His wife, his brother Abraham, and John Nice, are appointed his executors in the last clause : after the decease of the two former, one executor only would be left to sell.- Substance, as well as form, was wanting to render this an accuráte disposition of Jacob Arndt's property.
The features of this case upon the testimoney of Traill, much resemble that of Bartlett v. Ransden et al. Trin. 15. Car. 2. in B. R. which preceded the statute of frauds. It is reported in 8 Fin. 118, pi. 16, and is recognised by Roberts in his Treatise on Wills, 137. There the testator drew up, his own will, and sent it to counsel to be advised of the legality of it; and it was held to be no will, unless it had been published after it had been received back.
Arndt appeared urgent to Traill to have the will drawn, from which circumstance he supposed it to have been done. How then can we account for his not completing this business, unless we suppose, that his intention was suspended from what passed in his last interview. He concurred with Traill upon his showing to him, what seemed rather inconsistent in his dispositions. When did he return to his former state of mind ? And how long did it last ? A design to make a will, containing certain dispositions of the party’s whole property, but looking forward to something further to be done before its final completion, if such other matter remains unexecuted, is clearly inoperative in my idea, though the design was reduced to writing. We are not at liberty to indulge conjecture as to any change or settled purpose of his mind at subsequent periods of time. We have no data in the evidence from which we can draw any reasonable conclusions. Unless we are satisfied, that the instrument propounded, was meant by him to operate as his will after his death, I do not see how we can establish it. Preserving also fhe will of 1803, uncancelled, fortifies the presumption contended for by the appellees : from what the t^tator had before done, and from his application to Traill to draw his will from the sketch prepared by himself, we may well infer what Were his ideas of a perfect will, and that he did not intend this memorandum as such. The circumstance of keeping *268 this memorandum uncancelled, is of no great weight with me, when I reflect on the unsettled state of his mind in his last interview with Traill, and that the same argument applies with equal force at least, as to the regularly executed will of 1803.
Upon the whole, I am of opinion, that the decree of the Register’s Court be affirmed.
Brackenridge J.
I incline to support the paper of 1812, as the will of Jacob Arndt. It was his will when he brought it to Traill, subject to such alteration in matter of form as he ('Traill) might think it necessary to make. It was his will when he took it away subject to such alteration, in matter of form, as Mr. Sitgreaves might advise to be made. Still it was only as to form that any alteration was contemplated to be made. I am not of opinion that any alteration as to form could have made it better. There is no inconsistency between the fifth and sixth sections, as Traill would seem to have supposed. The sale spoken Of in the sixth section does not refer to the sale spoken of in the fifth, but to the sale spoken of in the introductory part of-the will, and before the bequests began; the sale of all his estate, the two houses excepted. There are two sales spoken of, one in the first instance and one in the last. The sale spoken of in the sixth section refers to the sale spoken of in the first instance, for that was a sale in the wife’s lifetime. But the sale spoken of in the fifth section was that of a sale after the wife’s death, for it was of a sale of property that could not be sold until after her death. The testator, therefore, seeing no inconsistency, as there was none, upon re-examination, may be presumed to have rested upon the will as made, and to have put an end to his deliberation as to the form of the will, and the arrangement of the dispositions and perspicuity of terms which was the only thing he would seem to have had any deliberation about. Form and not substance, was the only thing he could be said to have had any idea of altering. If he had taken away the paper with the idea of putting in the word Elizabeth, th<?name of his wife, a thing totally unnecessary, as he had not two wives at the time, would it be said, that in this case it did not remain his will ? I apply the same thing to the want of the words, “ sale so made in the first instance,” in the sixth section, because the meaning must be sale so *269 .made in the first instance, for ,the sale so spoken of was a sale to be made in the lifetime of the wife.
Decree reversed.