## STRICKER *against* GROVES.*

### IN ERROR.

Under the act of the 8th of April, 1833, relating to last wills, a will must be signed by the person making the same at the end thereof, unless prevented from signing it, or from directing another to sign it, by the extremity of last sickness. *Semble* that a long standing and continued infirmity as a chronic disease, would not be such extremity. The deceased, by reason of an infirmity of the hands of some standing, was unable to write, but directed others to sign his will for him, who refused so to do from misapprehension of the law : *Held,* that such refusal with a continued exertion at each opportunity to have the will signed, was not a compliance with the provisions of the act.

ERROR to the District Court for the City and County of Philadelphia, to remove the record of an action of ejectment for a house and lot of ground in the city of Philadelphia.

In the Court below, both parties derived title under Leonard Stricker, who died on the 28th of August, 1834. The plaintiff as as his next of kin ; the defendant, Mrs. Eliza Stricker, his widow, under an alleged devise from him.

The principal question in the cause was, whether the paper purporting to be a will, under which Mrs. Stricker defended, was a valid instrument. This paper was prepared in the office of Mr. Hœckley, a scrivener. It contained the usual certificate for the the attestation of witnesses, but was without date and without signature. The following is a copy of it.

" Be it remembered, that I Leonard Stricker, of the Northern Liberties of the city of Philadelphia, gentleman, being of sound mind and memory, praised be the Lord for the same, have thought proper to make, and hereby do make my last will and testament, in manner following, to wit.

First. I will that all my just debts and funeral expenses be duly paid and satisfied.

* I am indebted for the report of this case to Peter M'Call, Esq.—REP.

(Stricker *v.* Groves.)

Item. All the rest, residue, reversion and remainder of my estate, real, personal and mixed, whatsoever and wheresoever, I give, devise and bequeath unto my beloved wife Eliza, her heirs, executors, administrators and assigns forever.

Item. I nominate and appoint my said wife Eliza sole executrix of this my last will and testament, hereby revoking all former wills by me made, and declaring this only to be and contain my last will and testament.

In witness whereof, I have hereunto set my hand and seal this day of        in the year of our Lord, one thousand eight hundred and thirty-four.

Signed, sealed, published and declared by the testator, Leonard Stricker, as and for his last will        [ L. S. ] and testament, in the presence of us."

Joseph Singerly gave the following testimony in relation to the will. " I have seen this paper before. I think it was drawn by his request. I heard him say he was satisfied with this as his will; and I should lay it on the bureau, and he would sign it. I can't recollect how long it was before his death—probably three or four days, I don't recollect distinctly the conversation which took place. I remember asking him whether he thought he should get well. He said he thought he should not get well, but he thought he should get well enough to sign the will. His hands were cramped, and that was the reason he gave for not signing it. I asked him if he thought he should get well. He said he thought not. I asked him if he had settled his business, he replied ' yes ; you know I told you it was all settled.' A question was asked him whether his will was reduced to writing. He said, ' you know the situation of my hands: I cannot write. I'll have it fixed in a few days.' I don't recollect how long it was before his death: but all my conversations with him relative to his worldly affairs were within ten days of his death. I had the paper in my hand when he told me to lay it on the desk. I got it off the bureau. He asked me to get Mr. Hœckley to write a will for him. I called on Mr. Hœckley. He was not in town. It was before this paper was seen there. Mr. Stricker knew the contents of this paper. I read it to him. He said, ' that's right, that is the way I told you.' That was the last time I saw him alive. No one was present but myself with Mr. Stricker. I think I saw Mr. Dickens there the day before his death. Mr. Dickens came in after Mr. Stricker told me to put this on the bureau. It was may be an hour after. I dont know why Mr. Dickens came. Mr. Samuel Lower was there at the same time. I don't know why he came. They came up stairs in the front room—his room—and I left the room. Nobody left in the room with them but Mr. Stricker. Not a word passed between them before I left, as I remember. I had been there half an hour. He asked me once or twice to call Mr.

Lower to be a witness. It was before they came. I think it was after I saw that paper. It was after he said to me he would sign it when he was able. No one was present when he asked me to call Mr. Lower. I told Mrs. Stricker, my sister, that he had requested it. I don't remember I saw him alive after they went away. His hands appeared to be drawn. I have seen him crawl on the floor with his hands turned in. I don't think he was capable of holding a pen. I got his signature six months before he died, and 1 held the pen in his hand. He made a miserable scrawl. He was worse afterwards. I was riding with him probably a month before his decease, in a carriage. He said he had settled his worldly affairs. I told him I was glad to hear it. He said 'yes; your sister is to have all I have got in this world.' He said, 'I want her to take care of John, (i. e. John Groves a small boy,) till he is sixteen years of age; and if the rest of the relations take as good care of the other boys as I have of John, they will have no cause to complain of their relations.' I asked him if he did not mean John should have the one-half of his property. He said no; they had enough of their own. He told me he had named me as executor. I saw him half a dozen times afterwards—frequently two or three evenings in a week."

Cross-examined.—"Mr. Stricker was an intemperate man. He had a small amount of liquor supplied to him every day by his wife. I gave him several times out of the decanter. His wife was sole manager. His wife told me she gave it to him. When I gave him any, I told her I had done so. I thought there was no hope of his hands getting better. His hands were growing worse. He was about sixty years of age. I did not go to call Mr. Lower. I told my sister to send. I drew a will for Mr. Stricker myself. I did it at the time he declined signing this paper. I thought there might be something in this he was not satisfied with. He did not sign the other. I do not know what became of it. He refused to have any thing to do with it. I laid it on the bureau with the other. It was drawn during that same visit, down stairs. Mrs. Stricker was in the house, in and out. I think both of the papers were left in the room when Mr. Lower and Mr. Dickens came in. I have not been in the habit of drawing wills. I am a carpenter. Mr. Stricker never desired me to draw a will for him."

Re-examined.—"Mr. Stricker said, 'lay that paper on the bureau, and I will sign it; in the course of the day my hands will get better.' I thought he was dissatisfied, and I went down and drew a sketch of a will, four or five items, and I bequeathed his property; and I came up, and he served it as most meddler's wills are—threw it away, and said he would have nothing to do with it. He then referred to the paper which Mr. Hœckley wrote. He asked, 'which is that paper? lay it on the bureau, and I'll sign it.'

(Stricker v. Groves.)

I understood he objected to sign it for the moment. He generally appeared languid about 10 or 11 o'clock ; and it was about that time. I know another will was prepared. I saw the paper in Joseph Lury's hands several weeks before his death. Joseph Lury drew it. Mr. Lury told me he drew it. He did not say he drew it at Mr. Stricker's request. It was about three weeks before his death. Stricker commenced the conversation relative to the disposition of his property."

Samuel Lower testified as follows. " I called in on several occasions—said to be at his request. I asked him what he wished, and he referred me to a paper on the bureau. (The will.) I asked him what he wished me to do with it. He said he would like to have me read it to him. I read it to him. I asked him if he was satisfied with it : he said he was satisfied with it perfectly. I asked him if there was no other person he wished to have any of his property. He then said his people had sufficient, provided they would make good use of it. I then particularly referred to John Groves. He said he intended he, or his wife, if he should not live, to bring the child up till he was sixteen years of age ; and he said that he thought that would be sufficient on his part. I then asked him why he did not sign it. He told me he was not able to do it. He showed me his hands at the same time. He asked me to sign it for him. I told him I thought it would not do in a case of that kind. Mr. Dickens was in the room twice. He was in at that time. I don't recollect Mr. Dickens said any thing. His conversation was addressed to me. His hands were crippled. I read the will at different times—more than once. He always said he was satisfied with it. I should not think he was able to sign it. Mr. Dickens was not present all the time. He was when I read the will. I don't recollect any one else was present. I think I was told before I went up stairs, that Mr. Stricker wished to see me relative to a paper lying on the bureau. He said he would get somebody else to sign it when I refused. He died perhaps five or six days after that. I did not see him again before his death. It was more than one day, at any rate two or three days. I did not see Mr. Singerly up stairs that day. I was there before Mr. Dickens. I do not recollect when Mr. Stricker died, or when buried. The will was read article by article, and asked him at the conclusion of every article how he liked it. I did read one other paper than the one shown to me. He asked me who drew that paper. I was unable to tell him at that time. I was eventually told that Mr. Singerly drew it. He was dissatisfied with it. He said that Mr. Hœckley ought to draw it. I do not know anything that Mr. Lury drew which has been referred to."

Cross-examined.—" Mr. Hœckley's will was read to him more than once. I have no particular reason for having read it more

(Stricker *v.* Groves.)

than once. He never asked any one more than once to sign the will in my presence. John Groves came for me once or twice. My wife came in and told me that Mr. Stricker wanted to see me. When I had leisure time I went in to see him without being sent for. It was during the last month of his illness that the will was presented to him. I think it was about two or three weeks before his death when I first saw this paper in his possession."

Rachel Lower, sworn.—"I knew Leonard Stricker. I knew him for, if I mistake not, nine years. I lived directly next door to him. I was in the room when he died. I think he died on the 23d of August. I cannot recollect the year. I had no conversation with him at the time he died. My husband was at Mr. Stricker's six or seven days before he died. I conversed with Mr. Stricker five or six weeks before he died. I spoke to him before he died. Mrs. Stricker asked him to sign his will before me. He said he would try, but could not. He said he was unable to do it. He said his wife had to feed him like an infant. He said he had heard the will read. He said it was his will. There was a paper there at the time. It was read by Mr. Singerly. He said he did not wish John to have any property, and that his brothers had had enough. He said that all his relations had had enough. He then said that he was unable to sign his will. He was not able to write. I never from that time until his death knew him to be able to write. He told me that Mr. Hœckley wrote the will. I went home and told my husband that Mr. Stricker wished to see him; at Mr. Stricker's request. He said that he wanted my husband to sign the will."

Cross-examined.—" He could not move his hand, was the reason why he could not write."

Mrs. Sarah Ulrick—" I am a sister of Mrs. Stricker. I knew Mr. Stricker thirteen or fourteen years before his death. In the latter part of his life I staid with him one night, about six nights before his death. I asked him whether he had any particular pain or trouble on his mind. He said, No, that he had no pain. He said he had no trouble. I asked whether his business was all settled. He said, Yes. I then asked him why he did not sign his will. He said, 'sign it, you can sign it,' to me. I told him no, I could not, perhaps it would not be as he wished; I would call Mr. Lower. He said it would. I asked him whether he wanted to have any thing. He said no. I then said I would call Mr. Lower and left the room. I went down and called Mr. Lower. Mr. Lower came. Lower and Dickens both came. Mr. Stricker did not say anything when I said I would send for Mr. Lower. I had no knowledge from Mr. Stricker that Mr. Hœckley drew the will. I think it was about six days after that, he died. He was entirely helpless as to his hands. I have picked his teeth for him. My sister had

been married to him between twelve and thirteen years. I do not think it was possible for him to write."

Cross-examined.—"Mr. and Mrs. Stricker lived on good terms unless Mr. Stricker was under the influence of liquor. That was sometimes the case; it would last about the week. He would then be sober several weeks. He was sick about fourteen months. He was helpless about ten months."

Re-examined in chief.—"They were perfectly kind to each other. He thought a great deal of her."

Mrs. Catharine Singerly.—"I knew Mr. Stricker for about six years before his death. The latter part of his life I lived about two squares from him. I generally saw him two, three and four times a week, towards the close of his life. On one occasion, about three or four months before his death, Mrs. Stricker sent for me to keep house for her. He then told me his will was made: that he had left all to Eliza. I asked him about little John. He said that they had enough. He said that his wife was affectionate, and well earned all she would get from him. He asked me whether Eliza had gone, whether I had locked the door. He then began to talk about his will. His hands seemed as though they were all cramped up. He introduced this matter as a secrecy to me, as it would be a satisfaction to the Singerly's to know of it. I left him after dark. Mr. and Mrs. Stricker lived on very friendly terms, I believe, only in regard to his getting liquor. He never spoke to me in regard to his property at any other time. This was two, three or four months before his death. He died on the 28th of August, 1834. I had seen him about a week before his death. Nothing particular took place. I went up to him and took hold of his hand, he could not shake hands. I never communicated these until, I guess, six months after his death."

Jones Justice, before whom the cause was tried, instructed the jury as follows.

"The act of the 8th of April, 1833, section 6, relating to last wills, requires, among other things, 'that every will shall be in writing, and, unless the person making the same shall be prevented by the extremity of his last sickness, shall be signed by him at the end thereof, or by some person in his presence and by his express direction; and in all cases shall be proved by the oaths or affirmations of two or more competent witnesses, otherwise such will shall be of no effect.' Previously to the passing of this act, it was not necessary in Pennsylvania that a will should be signed by the testator. Since that act it is indispensable in all cases except one, that a will should be signed. Yet the testator need not sign it with his own proper

hand : he may, if he choose, direct any other person to do it for him in his presence, and the signing is sufficient; and that too, whether the testator is able to write his name or not. Undoubtedly, if there be no reason why a man should not sign his name with his own hand, it would be better that he should do so. If his handwriting is well known, there would be less difficulty in proving his will; and there may be other reasons. Still, so far as the requisition of the act of assembly goes, either method is sufficient; and if the execution of the will in either form be proven by two witnesses, the will would be legally authenticated. The provision which allows a testator to direct another person to sign for him, is obviously of most value to those who cannot sign for themselves; and the legislature undoubtedly had in view chiefly the cases of such persons. But the expression of the act applies equally to all persons, whether they can sign their names or not. The act also requires that the will should be signed at the end of it. This provision is not peculiar to this state. A similar provision exists in the laws of the state of New York. As this provision has been made the subject of comment by counsel, it may be proper to say a few words to show the reason of it.

The Statute of Frauds (29 Car. 2), enacted about the time of the settlement of Pennsylvania, provided that every devise of lands that should not be in writing, and signed by the hand of the testator or some other in his presence, and by his direction, and attested in his presence by three or more credible witnesses, should be void. This statute has also been referred to by the counsel. Under it the Courts decided, that if the testator wrote his name *at the beginning* of the will, it was a sufficient signing of the will, if the will was wholly in his handwriting. The effect of such a decision in this state (where it never has been necessary to have subscribing witnesses,) would be, at least in some cases, to leave it uncertain whether the paper was intended to express the settled purposes of the testator's mind or not. A will is often the result of repeated efforts. A man may draw many wills before he can satisfy his own mind. Or he may take his pen rather with a view to digest a testamentary plan, than to settle definitively at the time a formal instrument. Now the object of requiring a signature at the end of the will, is to denote that the instrument is completed; that the mind of the testator is fully made up to dispose of his property in the manner expressed. It is to fix upon and appoint a badge or unfailing mark whereby it shall be known that the paper contains the settled purposes of the testator. Every man who signs a paper at the end of it, expects to be bound by what it contains; and hence we may conclude safely and naturally, from the mere fact of a man's signing a testamentary paper at the end, that it is his will. On the other hand, if a man withhold his signature from a testamentary paper drawn by him, or by some one else for him, we naturally conclude that his mind is not unwaveringly fixed, and therefore that the paper is not his last

(Stricker *v.* Groves.)

will. Men do usually execute their wills by signing them at the end, if their minds are fully made up, and that too, whether their names are written at the beginning of their wills or not. The act of assembly proceeds upon this reasonable presumption. The object of the legislature in requiring wills to be signed at the end, is not to abridge men's rights over their property, or to hamper them by unreasonable and unnecessary formalities in the disposal of it, but to provide a means whereby Courts and juries may easily and safely decide what a man's will certainly is. No reasonable man can desire that the law should be so vague, that a paper may be set up after his death as his will, which is not his will. Yet before this act of assembly, no man could prudently put pen to paper for the purpose of digesting a plan for his will, and preserve even any rude and imperfect sketch which he might make to aid his further attempts to draw a will. For if he should suddenly die and leave such a paper, it might be established as his will. But by requiring that the will should be signed at the end, in order to show that the paper is finished, and that the author's mind is made up, a man is not obliged to destroy every testamentary sketch he may make, at the peril of having it established in case of his death. The act then is founded upon a reasonable presumption, and it does not allow the presumption to be disproved, except in one way, *namely,* by proving that he was prevented from signing it, or having it signed, by the extremity of his last sickness. The law also presumes that every man can sign his will, or cause it to be signed, if he is not prevented from doing so by the extremity of his last sickness. If a man dictate his will to a scrivener, and while the scrivener is preparing it for a formal execution, if the testator becomes so ill that he can neither sign it nor direct another to do so, and should die in that condition, the fair presumption would be that the extremity of the sickness prevented the execution of the paper. But if the testator should recover from his sickness, or become so much relieved from the pressure of it that he could sign it, and still should not do so, the presumption of law would be that he did not intend the paper as his will. But in all cases of this sort, the question concerns a matter of fact to be determined by the jury. As the question arises in this case, I have thought it not improper to submit to you these observations, and illustrations of the principles upon which the act of assembly is founded. It is necessary that you should understand the true meaning of the act in order to comprehend the true import of the question which you have to determine. The defendants contend that the case they have proven is within the exception of the act of assembly. The plaintiffs deny this. They also deny that Leonard Stricker ever intended to sign this paper. In fact, they say he was *non compos mentis.* All these questions are in some sort connected with the question *of prevention by extremity of his last sickness.* The idea that a man is *prevented* from doing a thing,

(Stricker *v.* Groves.)

implies that he *intended* to do it. So the idea of *intention* to do a thing, presupposes a mind capable of a rational purpose. A person *non compos mentis* is not deemed in law to be capable of intending any thing. I will, however, ask your attention in the first place to the question whether, supposing Mr. Stricker to have had the capacity requisite to make a will, he was prevented from signing it, or having it signed, by the extremity of his last sickness. This question requires you to consider carefully the evidence relating to Stricker's condition during the interval of the drawing of the will, and his death, viz. between the 16th or 17th and the 28th of August, 1834. It is indispensable that a will should be reduced to writing, in order to convey real estate. However sudden or severe or rapid in its progress a man's sickness may be, he cannot devise his real estate by word of mouth, without writing. No extremity of last sickness will supersede the necessity of having a will of lands reduced to writing. Of course it is of no importance, as it respects this question of prevention, to inquire into the condition of Leonard Stricker, before the day when the paper in question was prepared by Mr. Hœckley, and taken to Mr. Stricker. (Here the judge referred at length to the testimony in the cause referable to this question, and then said :) The defendant's counsel have requested me to charge as matter of law, that under the circumstances of this case, the will is valid without being signed by Mr. Stricker, or by any person in his presence, and by his express direction. If the circumstances of the case, as shown by the evidence, prove that the extremity of his last sickness prevented the signing of the will in that manner, it would be valid without being so signed, if Stricker was of sound mind and memory, and the authenticity and testamentary character of the paper is proved to your satisfaction by at least two witnesses. The evidence, however, is, that Mr. Stricker died of a lingering illness. Mrs. Ulrick says he was sick about fourteen months, and helpless about ten months. Still he retained his powers of speech (so far as it appears,) to the last. The infirmity of his hands was of long standing. Mr. Singerly says that six months before his death, he got his signature; that he made a miserable scrawl, and got worse afterwards. A reasonable construction must be put on the words of the act of assembly ; and it seems to me, that it would be unreasonable to call a continued infirmity of this sort, the extremity of his last sickness. If the *mere fact* that he was unable to use his hands, unconnected with any other circumstances, would take the case out of the general rule established by the act, I see no reason why this paper might not be established, if it had been drawn at the commencement of the infirmity, as well as at the conclusion of it. The same observation may be applied to the general infirmity of his body. And if this expression of the act can be applied to the case of a will, in which the testator is the subject of a chronic disease, which makes slow and imperceptible, but sure and fatal approaches,

(Stricker *v.* Groves.)

it must be restricted to the last stage or extremity of it. Besides, when a man retains his understanding, and his power to converse freely, the general infirmity of his body, or the particular infirmity of his hands, though it might prevent him from signing his name with his own hand, cannot be said to prevent him from having it signed by some person in his presence. But it is said, (and this is another point made by the defendant's counsel,) that the direction given by Mr. Stricker to Mr. Lower, to sign the will, and his refusal to do so, is equivalent to his having signed it. · The fact is, and the fact appears by inspection of the paper, that it was not signed; and nothing can be equivalent to his having signed it, or rather can supply the want of a signature, but prevention by the extremity of his last sickness, which is a question of fact for you to decide. Could Mr. Stricker, if he had been seriously disposed and fully determined to have the will signed by some one in his presence, have done so ? If he could, then he was not prevented by his sickness.   You need not inquire why the paper was not signed, if the evidence proves that it was not owing to his sickness during the extremity or last stage of it.   He may have had a variety of reasons, but the presumption of the law is, that nothing but the extremity of his last sickness would have prevented the execution of it by signing, if the paper was really his will. The burthen of proof, on this question of fact, rests upon the defendants."

Afterwards, the jury returned to the bar of the Court, and desired instructions upon the following questions.

" 1. Did Stricker's losing the use of his hands reduce him to the extremity of his last sickness ?

2. Did the refusal of the persons (requested) to sign for him reduce him to the extremity of his last sickness ?

3. Was the request from Mr. Stricker to Mr. Lower and others, to sign the will, and being refused by them, equivalent to signing ?

4. Would a continued inability of the hands of Stricker, the deceased, taken together with a continued exertion at each opportunity to have the will signed, be equivalent to a last extremity ?"

To each of which questions, proposed by the jurors, the Court answered by a negative.

A verdict having been rendered for the plaintiffs, Mrs. Stricker brought a writ of error to this Court, where it was argued by Mr. *M'Call* and Mr. *D. P. Brown*, for the plaintiff in error, and by Mr. *C. Ingersoll* and Mr. *J. R. Ingersoll*, for the defendant in error.

The opinion of the Court was delivered by

ROGERS, J.—The act of the 8th of April, 1833 requires that every will shall be in writing, and, unless the person making the same shall

be prevented by the extremity of his last sickness, shall be signed by him at the end thereof, or by some person in his presence, and by his express direction. The construction given to the act of 1705 rendered some change in the manner of authenticating wills highly expedient. Under the latter act it was held, that it was not necessary that the will should be sealed; nor that all the subscribing witnesses should prove the execution; nor that the proof should be made by those who subscribed as witnesses; nor was it necessary to its validity, that the witnesses should be present and see it executed, if written by the testator himself; and when special instructions were given, and a will was drawn conformably thereto, in the testator's lifetime, though he did not sign it, it was held a good will in writing. 1 *Dall.* 94. 2 *Binn.* 414. 1 *Serg. & Rawle,* 256. 1 *Yeates,* 87. For remedy of some of these evils, the revised code requires that the will shall be in writing; that it be signed by the testator, or by some person in his presence, and by his express direction, at the end thereof; and this formula is indispensable, unless the person making the same is prevented from signing, or giving the necessary directions for signing, by what is termed in the act the extremity of his last sickness. The manifest intention of the legislature in that section is to provide a remedy for the mischiefs which arose from admitting a paper to probate incomplete in its form, and which in many cases there was great reason to believe was intended for no other purpose than as memoranda for himself, or instructions for others, or a crude, informal, and incomplete essay towards a future complete and formal bequest of his estate. The establishment of such a paper, when it contains but a partial distribution of his property caused great inequality and consequent injustice, among heirs; and would do any thing, rather than express a settled purpose for a testamentary disposition of his estate. To put an end to all doubt and uncertainty attending such imperfect instruments, the legislature has wisely altered the former law, by requiring that the *animus testandi* should be unequivocally manifested by the signature of the testator at the end of the paper, unless prevented by an absolute inability on his part to comply with the requirements of the act. When signed at the end, the usual and familiar mode in the transactions of life, to show assent to a written contract, the will is complete, and all doubt as to intention is removed. In these indispensable particulars this paper is defective. It was written by a scrivener, at the request and according to the instruction of the wife, who is the sole devisee, and without any previous communication with the testator. The paper is without date, nor is it signed by him, nor by another in his presence. It is not only incomplete in its form, but it is unexecuted, and only entitled to probate when it is clearly shown that the testator was prevented from observing the prescribed directions, by the extremity of his last sickness. What is a last sickness, or the extremity of a last sickness, we are not called upon

(Stricker *v.* Groves.)

to define; although I agree that it were unreasonable that a long standing and continued infirmity, as a chronic disease, should be deemed to fall within the category. For if a person should be afflicted with a severe disease, and apparently *in extremis*, signing by the testator cannot be dispensed with, if he should recover from its effects. In this feature it resembles a nuncupative will, which is not good, unless it be made by the testator when he is *in extremis*, or overtaken by sudden and violent sickness, and has not time and opportunity to make a written will. A man dictates a will to a scrivener, and while he is preparing it for a formal execution of the testator, becomes so ill that he can neither sign it, nor direct another to sign it for him, and dies in that condition, the presumption is a fair one, that he was prevented from its formal execution by the extremity of his sickness. But if the testator should recover, or become so much relieved from his disease, that he could either sign it himself, or direct another to sign it for him, a contrary presumption would fairly arise from his omission to do so. We would have a right to infer, and particularly if he lived some time after, that he had changed his mind, and that he neither wished nor intended that the paper should be taken as his will. The proof is, that the alleged testator was for a long time disabled in his hands, so much so, that he could not write legibly, if at all; but there was nothing to prevent him from authenticating the paper by his mark; nor is it alleged that he was incapacitated by disease from giving directions to others to sign it for him. But it is insisted, that his continued inability to sign the will, with his repeated application to others to sign it for him, and their refusal, is a compliance with the requisitions of the act. The impossibility of his compliance with the act does not appear. In truth there is reason to believe that he studiously avoided attempting to sign the paper which had been prepared for him with such care, and that he anxiously evaded giving any express directions about it. All he could be prevailed on to say, appears to have been said with a view to rid himself of the importunity of the interested individuals by whom he was beset. Nothing can be collected from the evidence, which to my mind looks like an express direction to any person to sign the paper for him; and on this point we should not rest satisfied short of most clear and convincing proof. But admitting the facts to be as represented, still this paper has not the necessary characteristics of a devise. The paper must be actually signed, unless the signature be prevented by the state of health and condition of the testator. It is not enough that the omission to sign arose from the misapprehension, mistake, folly or perverseness of those to whom he may have applied for that purpose. If a testator, intending to make a will in favour of particular persons, is prevented from doing so by accident, equity cannot grant relief. 1 *Atk.* 448. *Whellan* v. *Russel*, (1 *Story's E.* 118.) So where a person, by reason of sickness, or for other cause, is unable either to write a

(Stricker *v.* Groves.)

will himself, or to procure a will to be written for him, it is a misfortune which does not admit of remedy, whatever injustice may result to others from the peculiar circumstances in which he may be placed.　It is far better to submit to the partial mischief which may arise from a case which is by no means common, than to run the risk of fraud, which will inevitably be consequent on the corruption and profligacy of individuals by whom he may be attended in his last moments.　And these considerations have peculiar force here, where the law makes so equal and just distribution of intestate's estates.　If the paper be not signed, it is unnecessary to argue why it is not signed, unless the omission to execute the instrument arises from the mental imbecility, or bodily infirmity of the testator, a total incapacity on his part either to sign the paper, or to give the required direction to others.　We are of the opinion that there was no error in instructing the jury, that the testator losing the use of his hands, the refusal of the persons whom he requested to sign the paper for him, and a continued exertion at each opportunity to have the will signed, was not a compliance with the requisitions of the act.　In conclusion; it is well to remark, that fraud is not alleged.

Judgment affirmed.