## Hunter's Estate

Before Van Dusen, P. J., and Stearne, Sinkler, Klein, Bolger, and Ladner, JJ.

*Max Walls*, for exceptants.

*Edwin J. McDermott*, contra.

BOLGER, J., July 16, 1937.—The exceptions present a single question: Should the will have been admitted to probate or an issue devisavit vel non have been awarded? See Wagner's Estate, 289 Pa. 361. The answer depends upon whether, within the provisions of section 2 or section 3 of the Wills Act of June 7, 1917, P. L. 403, as amended, the instrument before the hearing judge was a validly signed and executed will. He decided it was not. The formula we must now use is: Are the findings of fact and conclusions of law adopted by the hearing judge supported by competent evidence? See Carmello's Estate, 289 Pa. 554. Is there a substantial dispute upon a material matter of fact? See DeLaurentiis' Estate, 323 Pa. 70.

Disregarding all questions of credibility, good faith or interest of the witnesses, the following is a résumé of the important points in the case and represents the strongest competent evidence advanced by the proponent in support of the writing being declared a valid will.

### Mr. Hunter's physical and mental condition

Hunter was afflicted with cancer and had been bedridden for at least two weeks, during which time he had been for at least a week in the hospital and then returned to proponent's home a few days before he died. The alleged will was drawn and the incidents connected with

the alleged signing and execution thereof occurred during the morning and afternoon of the day on which he died. Death came at 8:30 p.m.; on that day "he was weak, could not eat, and all he lived on was whisky and milk with an egg in it". Proponent testified that he was rational and discussed several things in connection with the will. According to the attending physician, Mr. Hunter was too weak to sign the will.

The record does not disclose exactly when the first evidences of immediate death appeared, but it is clear that it must have been later than 2:30 p.m.

### Draft, *signing and execution of instrument*

The subject of a will was suggested by Mr. Hunter while he was being bathed in the early morning of the day involved; he said he wanted to give his bank book and other property to proponent and his clothes to her janitor; he directed proponent to have a real estate man or notary public visit him; proponent went to the real estate office and asked the notary to do so, but the latter refused. However, he drew a will and gave it to proponent with directions for its execution. Proponent returned to the house and with the aid of her janitor propped Mr. Hunter on a pillow while he made his mark on the paper in the presence of proponent and of the janitor. Proponent then asked Hunter if she should sign as a witness; he replied: "No, you are the one who is going to receive this, you don't sign." All of this happened not later than a few minutes after 9 a.m. Later, the attending physician came; according to proponent, this was at 2:30 p.m. He was requested by proponent to witness the writing. Observing the mark, as well as the absence of Mr. Hunter's signature, he subscribed Mr. Hunter's name and directed proponent to have Hunter remake his mark. All of this occurred on the first floor out of the presence of Hunter, who was bedridden on the second floor. Thereupon, proponent said, she took it upstairs, and Hunter, in her presence and in that of the janitor, remade the mark. However, the janitor's testimony does not sub-

stantiate her, because he said that his sole connection with the transaction took place in the morning. Nowhere does it appear that Hunter requested or approved or had anything to do, directly or indirectly, according to two competent witnesses, with Dr. Robrecht subscribing his, Hunter's, name.

From this review of the testimony we must ascertain whether, under the act of assembly and the decisions construing the same, Mr. Hunter was prevented by the extremity of his last illness from signing the instrument; and whether or not, according to the testimony of two or more competent witnesses, his name was subscribed in his presence and by his direction and authority.

Under section 2 of the Wills Act, supra:

"Every will shall be in writing, and, unless the person making the same shall be prevented by the extremity of his last sickness, shall be signed by him at the end thereof, or by some person in his presence and by his express direction; and, in all cases, shall be proved by the oaths or affirmations of two or more competent witnesses; otherwise, such will shall be of no effect".

Section 3 of the act provides:

"If the testator be unable to sign his name, for any reason other than the extremity of his last sickness, a will to which his name is subscribed in his prescence, by his direction and authority, and to which he makes his mark or cross, unless unable so to do,—in which case the mark or cross shall not be required,—shall be as valid as though he had signed his name thereto: Provided, That such will shall be proved by the oaths or affirmations of two or more competent witnesses."

The best approach to a clear conception of the relevant provisions of the Wills Act of April 8, 1833, P. L. 249, can be gained by understanding that prior to its enactment a testator could, by an unsigned writing, proved by two or more credible witnesses, transfer both personal and real property: See Commissioners' Notes to section 2 of the Wills Act of 1917; that one of the purposes of this

act was to make the signature to a will necessary unless testator was prevented by the extremity of his last illness from signing it. The method of signing allowed by this act, as well as the Wills Act of 1917, may be personally or by another. But it must be signed unless testator is "prevented by the extremity of his last sickness".

We obtain a definite view of how the courts have construed the clause "prevented by the extremity" of last illness in reviewing the following authorities. If being personally unable to sign and having time and opportunity to ask another to do so testator fails to do it, the will fails: Stricker v. Groves, 5 Whart. 386. In Ruoff's Appeal, 26 Pa. 219, the court found the alleged testator had his senses and conversed about the will more than would have been necessary to ask someone to sign for him, and, therefore, the averment of extremity of last illness did not hold. In Plate's Estate, 148 Pa. 55, testator started to write his signature, stopped and said, "I can't sign it now", but the court found this did not excuse him from asking another to do so. Testator is entitled to a reasonable time to do so, as stated in Aurand v. Wilt, 9 Pa. 54, and in Showers v. Showers, 27 Pa. 485. In Butler's Estate, 223 Pa. 252, testator, in a rational interlude during his last illness, started to sign the writing but became excited and exhausted because of his wife's hysterical conduct, and stopped; the court held he was still capable of asking another to sign for him and refused the probate.

McClellan's Estate, 325 Pa. 257, is important in that it is the latest pronouncement of the Supreme Court on the subject of "last sickness". Although it deals with the attempted probate of a nuncupative will, nevertheless it is applicable because the courts have uniformly held that the phrase "last sickness" in section 4 of the Wills Act is synonymous with "prevented by extremity of last sickness", referred to in sections 2 and 3 of the Wills Act: Rutt's Estate, 200 Pa. 549. Miss McClellan had been removed to a hospital with a serious illness. Two days be-

fore she died she was reminded of making a will by the visit of a friend; accordingly, in the presence of witnesses, she dictated certain dispositions to a nurse who wrote them down. This required one hour to accomplish. Later, she orally confirmed the dispositions and in answer to a question said, "I have given, told you what I want done with my belongings; I am tired; let me alone." She then became exhausted, fell into sleep, then into a coma, from which she never emerged. The court held that Miss McClellan, under the evidence, was not at the time in such extremity as precluded a signed will.

The subject of testator's signing in a manner other than by name has occupied the attention of our courts on numerous occasions. It first arose shortly after the enactment of the Wills Act of 1833, in construing which the court said the legislature was more concerned therein with the place of signing than the mode of signing: Vernon v. Kirk, 30 Pa. 218. However, an execution by testator making his mark without more was consistently held insufficient: Greenough v. Greenough, 11 Pa. 489; until the enactment of the Act of January 27, 1848, P. L. 16, which provided:

"That every last will and testament heretofore made, or hereafter to be made, excepting such as may have been finally adjudicated prior to the passage of this act, to which the testator's name is subscribed, by his direction and authority, or to which the testator hath made his mark or cross, shall be deemed and taken to be valid in all respects: *Provided*, The other requisites, under existing laws, are complied with."

Thereafter, our courts were naturally more liberal in allowing probate of wills executed by the naked mark, as for instance in Vernon v. Kirk, supra, Strong, J., and Mitchell, J., in Knox's Estate, 131 Pa. 220, said that a mark was sufficient. We must advert, however, to comment that in neither of these cases was this question directly involved. However, the Act of 1848, supra, was repealed by section 3 of our present Wills Act of 1917.

In connection with this repealer, the notes of the commission reporting on this section of the Act of 1848 give the real intent of section 3 of the Wills Act of 1917. They read as follows:

"This phraseology is clearly open to criticism, as it might be understood to mean that a will, signed by the direction of the testator, although not in his presence, and although he was not in the extremity of his last illness, would be good, which, of course, would be inconsistent with the preceding requirements.

"The commissioners are of opinion that this section of the Act of 1848 should be corrected in its phraseology, as an exception to the general method of revision, for its reformation, unlike that of section 6 of the Act of 1833, last preceding, is not complicated by any long series of judicial decisions; and it seems desirable to clarify its language before any questions such as have been suggested may arise.

"The new section is intended to cover cases where a person is unable to sign his name, whether from lack of education or from physical weakness. The provision that the mark may be dispensed with if the testator be unable to make a mark is intended to cover such a case as that of a man who has lost both arms or is paralyzed."

There are many instances where our courts have held that a testator's mark made by him in conjunction with his name being subscribed by another is sufficient: Flannery's Will, 24 Pa. 502; Hersperger's Estate, 245 Pa. 569; Novicki v. O'Mara, 280 Pa. 411; to mention a few. But there is only one case where testator's naked mark without more has been accepted since the enactment of the Wills Act of 1917, supra; that was in Wilson's Estate, 88 Pa. Superior Ct. 556. But there, we observe, the Superior Court adopted the finding of the lower court that testatrix was in extremis at the time of making her mark. Under our facts, however, as hereinafter stated, Mr. Hunter was not in extremis and, therefore, the policy of strict construction heretofore adopted by our courts

must be applied. The reason behind this policy no doubt is that it rightfully closes the door on possible doubt, uncertainty, fraud and imposition: Rutt's Estate, supra.

Under section 5 of the Wills Act of 1917, testator's direction and authority to sign his name to a will may be either express or implied: Novicki v. O'Mara, supra; Carmello's Estate, supra. But in Hughes' Estate, 285 Pa. 466, 471, the court stated:

". . . when implied authority to sign the alleged testator's name is relied on and the implication must arise, as here, solely from the fact that the signing was in his presence, then it must appear that he saw his name placed on the document or was in a position to observe the performance of the act. Of course, it must appear also that he knew the nature of the document signed in his name when he placed his mark thereon."

However, Gest, J., in Picconi's Estate, 4 D. & C. 245, distinguished sections 2 and 3 on the subject of implied authority, pointing out that section 2, in terms, requires express direction, whereas section 3 does not.

Further, as stated in the syllabus in Kelly's Estate, 306 Pa. 551:

"A will signed by a mark will not be accepted for probate as a will when the subscribing witnesses who saw testatrix affix her mark did not testify that they saw her name signed at the end thereof when she made her mark, and there is total want of proof by the subscribing witnesses that the name of testatrix had been subscribed to the will in her presence and by her direction and authority."

Applying the rules laid down in the foregoing decisions, it is clear that Mr. Hunter was not prevented by the extremity of his last illness from signing his will, nor was he incapable of directing or authorizing his name to be subscribed thereto, and, while he was too weak to write his name, he was not too weak to ask someone else to do it for him; wherefore his name was not subscribed as required by section 3 "in his presence, by his direction

and authority". Further, we find that such a signing of the writing is not supported by the evidence of two competent witnesses, as required by both sections 2 and 3.

On these points the evidence is so convincing that we would be constrained, following a fair trial, to set aside any verdict other than one in accordance with these findings: Minnig's Estate, 300 Pa. 435; DeLaurentiis' Estate, supra.

The action of the hearing judge is amply supported by competent evidence on which there can be no substantial dispute. Therefore, his action in refusing the issue is sustained and exceptions thereto are accordingly dismissed.