## PORTER'S APPEAL.

A. in his last sickness called B. to him, and declared his wishes as to the disposition of his estate, and directed B. to write it down as his will, and called upon two persons to witness that that was his will. B. made a memorandum in pencil of A.'s intention; and A. died in one hour afterwards, but continued sensible to the last:—*Held*, there was no proof of a nuncupative will.

FROM the Register's Court of Delaware county.

*April* 13. An alleged nuncupative will of Woodward Crosley being offered for probate, and being objected to by one of the next of kin, the evidence given was as follows :—

Pierce : " Crosley sent for me early on the morning he died. I found him lying on the bed, with his clothes on. He told me to take from his pocket a key, and take out of his desk the deeds for his property where he then lived, and write an assignment in favour of his sister Mary. I thought there was not time, and told him so : *he then directed me to write it down as his will, and for us to witness it ;* he wished his sister Mary to have the property where he then resided, with all his personal property; his farm in Nether Providence he wished divided among his relations. He asked me twice if I understood him ; I repeated it to him, and he said it was correct. Nobody was present but his great niece, E. Suter, *and he called upon us both to witness that that was his will.* He did not live over an hour after this conversation, if that long ; his dissolution was approaching, he was restless at the time, rolling from side to side ; did not appear to be in great bodily pain, only uneasy and restless; *there was not time for him to have made a written will,* as he was not in a situation after that. He said he would die. This paper was committed to writing in a few hours after his death, the same day ; this memorandum contains the substance of what he wanted. *I noted the contents down at the time with my pencil.* The memorandum in pencil contains the substance of what he said at the time."

The pencil memorandum was as follows : "Woodward Crosley, on fifth day morning, 4th of fifth month, 1848, requested me to write an assignment of the deed of the place where he now resides, in favour of his sister Mary.

"Told me to write down as his will, and for us to witness it, that his sister Mary should have the place and all his property ; asked twice if I understood it."

Endorsed on this paper was the following :—"The following was taken down, as soon as I came home, from recollection. Being called upon by my neighbour Woodward Crosley, this 4th day of the 5th month, 1848, I visited him, and among other matters, he gave me the key to his desk, and requested me take his deeds out and select them for the place he now lives on, and write an assignment upon them in favour of his sister Mary. From his appearance I thought there would not be time, and told him so, and further said he had better tell me. He told me to write down as his will,

and for us to witness it, that his sister Mary should have this place and all his personal property; and then asked me twice over if I understood him. I told him I did, and repeated what he had said, and he replied, 'it is right,' and also requested me to settle his estate."

The will, reduced to writing by the witnesses within a few hours after Crosley's death, and offered for probate, was as follows:— "We do hereby certify, that being in the room with Woodward Crosley (yeoman), of the township of Upper Providence, Delaware county, Pennsylvania, on the fourth day of the fifth month, one thousand eight hundred and forty-eight, the said Woodward Crosley, being of good sound mind and memory, did in our hearing say, and to us stated that he should not live, he then being sick; that it is my will and request, that Mary Crosley, my sister that now lives with me, is to have both tracts of my real estate in Upper Providence township, together with all my personal property, and that my real estate in Nether Providence, I wish it to be sold and divided among my relatives, and requested of William T. Pierce to write it down, and the above was committed to writing the same day in which it was stated to us. In witness whereof we have signed our names this fourth day of the fifth month, one thousand eight hundred and forty-eight (1848)."

On cross-examination, the witness stated:—" The personal property of Crossley was about $4,000, and his real estate worth about $9,800. When I first went there, he told me he could not live— he requested me to write his will for him; I did not take these notes with a view to a written will. I told him there was not time to make a written will. He told me to write down as his will, he wanted his sister Mary to have as I have said; he wished me to administer. The first paper contains exactly what did take place—it was written immediately after I went home. I went down the road that morning to Squire Afflick's, to get him to write an assignment on the deed, if there was time. *This was before the death of Woodward Crosley, and after I took these notes.* I remained in his room *about half an hour before I left it.* It is a little over half a mile to Squire Afflick's. Squire Afflick did not come up with me; he came up there after me; he was dead before Afflick got there; *he died just as I got back.* I went to Afflick's at my own instance. I was in hopes there would be time, but I did not think so. I did not believe there was time to write the assignment on the deed when I went to Afflick's. I don't know that I did request Afflick to hurry. I took that memorandum for

the purpose of writing an assignment, if time had been allowed for the same. I did not take the memorandum to write a will from."

Elizabeth Suter, the other witness, proved "that Pierce was called into the house at the request of Crosley. When he came, Crosley said he wished his sister Mary to have, &c.; he lived about an hour after he was done telling him. He told Pierce to get the deeds; he wished to make an assignment of the deeds to Mary. Pierce told him he did not think the assignment would stand. He was sensible to the last minute. He was of as sound mind as ever. He died in about an hour. I think he was able to write when I first called Pierce. He might have been able to write after he said what he did."

On cross-examination, she said: " Crosley spoke of assigning the deed first. He told Pierce he wanted him to write his will. Pierce took a piece of paper to take it down, and wrote it down as he told him, and left soon after. He did not say he could not make a written will. He wished us to witness what he said. I don't remember that he said anything about writing a will. The notes might have been taken to write a will from, but I did not hear him say so. He called me by name, and told me to ' witness what I say.' He requested Pierce to settle his affairs."

The question was, whether the will could be admitted to probate. The court below decided that it might.

Another question was made in the cause. Mary, the legatee, died since testator, and appointed Elizabeth Suter a residuary legatee; she released to the administrators of Mary, and the question was whether she was thus rendered competent to support the will of Woodward Crosley.

It was argued at length by the appellants, who cited Post v. Avery, &c.; but the court declined hearing argument against the objection to her competency.

*Darlington* and *Tilghman*, for appellants.—Nuncupative wills are not to be favoured, 4 Raw. 46, and the *factum* of such will requires more strict and stringent proof than of written wills, in addition to all the requisites of the statute: 1 Add. 389. Now what was the will here? The three papers exhibit such discrepancies, as preclude a determination what was the will.

The law is settled under the statute that a nuncupative will is good only where it has been made in such extremity of the last sickness - as precluded a written one: 4 W & S. 361; 6 Ib. 189. Now such was not the case here. The testator lived for an hour

after declaring his intention; he was fully sensible to the last, and able to write; but the proof is still more conclusive. The will was written, and the witness walked half a mile and returned, before the testator died. How then can it be said, there was not time to write a will?

But was it his intention to make a nuncupative will? The proof is, he sent for the witness to write an assignment, and then directed him to write a will. His disposition of the real estate corroborates this view. It is impossible under these circumstances to support the will offered.

*Lewis* and *Edwards*, contrà.—The proof is clear that the testator verbally declared his will, and requested the witnesses to bear witness that was his will. It is also plain, both he and they supposed there was nothing further to do, that no signature was necessary or intended. Is it then within the statute? It is difficult to conceive a case more perfectly so: he died within an hour after uttering the words; he was in extremity and knew it. He was not able in such a condition to write his name. After the request to witness, there was nothing said about writing a will: if such a design had existed, it was plainly abandoned as impossible to be executed.

*April* 16.    COULTER, J.—A nuncupative will is, where the testator, without any writing, declares his will or testament, as to his personal estate, before two witnesses. The provisions of our statute are copied from those of the 29 Chas. 2, ch. 3, § 5, with the exception that, in England, there must be three witnesses. No case was produced on the argument, either from the English or American books, where it was held that a decedent, who intended to make a written will, which, for any cause, was left incomplete or unfinished, died testate by nuncupation of the unfinished will. I have met with but one case, that of Offutt *v.* Offutt, 3 B. Munr. 162, where it was ruled, that a paper not perfected as a written will, may be established as a nuncupative will, where its completion is prevented by the act of God.

But this depended much on the peculiarity, or rather distinctive character of the Kentucky statute. But even that case does not fit the one in hand, which, as I think is evident from the testimony, was not prevented from being completed by the act of God. But I doubt very much the fitness of that rule in this state, which doubt is strongly confirmed by no such English case being produced in the long line of their authorities since the enactment of the 29 Chas. 2.

The reason of the exigency appears to be the other way. If a decedent should be arrested by death when his will was half completed, and all the personal estate disposed of, you thrust upon him a testamentary disposition, probably contrary to his intent; for the direction which he gave to his personal estate may have been entirely controlled and influenced by the manner in which he intended to dispose of the realty. In such cases, the disposition of one often compensates for the disposition of the other. This rule would be unsafe, and would, probably, often result in establishing a testamentary disposition of personal estate contrary to the will and intent of the testator. There ought, therefore, to be present, in order to constitute a nuncupative will, not only the *animus testandi*, but the mind and intent to nuncupate. And where that is proved to exist, you get hold of the whole mind of the testator. That is, to leave the real estate to the legal representatives, according to law, and to dispose of his personal effects as he directs. The very circumstance of a decedent disposing in part or altogether of his real estate, is strong evidence that he intended no nuncupation, because real estate cannot be devised in that way, and all men are presumed to know the law. Let us see, then, whether we can ascertain from the testimony, what the testator intended to do. He was sick, suffering much pain ; but in full possession of his mind until his death. In the apprehension of that event, he directed the leading witness to be called in, and stated to him, that he wished to give the plantation he lived on to his sister Mary, and directed the witness to get his deeds for the land from his desk, and write assignments or transfers on them. The witness said there would not be time, as he testifies, and how he was gifted with the vaticination of a seer, is not shown; but the other witness testifies, that he replied, that, in his opinion, the assignment would not stand. However, the testator being obstructed in that design, said, according to the testimony of both witnesses, "Well, write it down as my will, and you witness it;" and, after stating what should be written as his will and witnessed by those present, he asked the scrivener if he understood him, who said he did. The scrivener then wrote, in the presence of the decedent and the rest in the room, as follows: "Woodward Crosley, on 5th day morning, 4th of the 5th month, 1848, requested me to write an assignment of the deed of the place where he now lives, in favour of his sister Mary. Told me to write down, as his will, and for us to witness it, that his sister, Mary, should have

this place, and all his personal property. Asked twice whether I understood."

This being proved by two witnesses, and there were no more present, would have been a good written will, previous to our late statute of 1833; and since that statute, it would have been good if the scrivener had written at the end of the instrument the testator's name, if he was unable to write it himself. He lived an hour afterwards, in much pain, rolling on the bed, but perfectly sensible, and talking to those present. Elizabeth Suter, the only witness besides Pierce, says she does not know that he could not have written his name; no attempt was made, and no inquiry on the subject. Pierce left soon after he had written the memorandum. Pierce drew up one act of nuncupation, in which he was named as the person to settle the estate. He afterwards drew up another, in which that is annulled. The papers are dissimilar in phraseology, and the last of them disposes of the whole real estate of the decedent, including that in Nether Providence, which the first does not. I feel constrained to say, that this is one of those cases which justifies the opinion of this court, as expressed in Yarnel v. Yarnel, 4 Raw. 46, that is, that nuncupative wills, although tolerated, are not to be favoured, and are only to be endured in the precise exigency contemplated by the statute, that is, where there is not time to make a written will. But the whole momentum of the testimony is clear, that the decedent intended to make a written will, and that leaning of the testimony is supported by the words of the memorandum written at decedent's request, "told me to write down as his will, and for us to witness it." What were they asked to witness? Why, his written will. If that was left incomplete, by the ignorance or wilfulness of the scrivener, the courts cannot therefore make a nuncupative will, against the will of deceased, and thereby let in a dangerous precedent upon society.

The statute obviously meant that the intent to nuncupate should exist. After providing that all wills shall be in writing, there is, by way of proviso, a provision to make a *nuncupative will* of personal estate, under certain restrictions; that is, a decedent shall be allowed, in extremes, to dispose of his personal estate, where he intends to do that, and had not time to make or complete a written will. For the whole scope and policy of the law is, that when there is time, the will must be written; but when there is not time, a verbal disposition of the personal estate alone is allowed in extremity. But, no word was spoken by the decedent of a nuncupative will. The completion of the written memorandum was not pre-

vented by the act of God, but by the wilfulness or ignorance of man. There was abundant time, after the memorandum was written, to have signed it, if testator was able, and there is no evidence that he was not; or, if so, the time was full of opportunity for the scrivener to write it for him.

There being, in the judgment of this court, no nuncupative act, it is unnecessary to decide whether or not Elizabeth Suter was, under the circumstances, a competent witness.

> The decree of the Register's Court is reversed, and a decree directed to be entered by the clerk, in favour of the appellant.