## Taylor's Appeal.

*Nuncupative will, how established.*

1. A nuncupative will cannot be established, where neither the words nor their substance, as used by the alleged testator, were committed to writing by any one, as proof of a bequest or to be preserved as such, and no proof was made of a request by testator to bystanders to bear witness that the words used were his will.

2. A letter written by one person, announcing to another the death of the alleged testator, and in a general way his disposition of his estate, is not such evidence as will make out a nuncupative will, especially where it was neither produced before the register's court nor proven to have been lost or destroyed; nor is a fragment of an unsigned letter, by the same witness, written two days after the testator's death, sufficient where no testamentary words were used nor the disposition of his property set forth, but only that he had left his property to his wife.

APPEAL from the Register's Court of *Philadelphia.*

This was an appeal by Anna Taylor, widow of George Williams Taylor, deceased, from the decision of the Register's Court, reversing the decree of the register, by which an alleged nuncupative will of deceased was admitted to probate, and letters of administration thereto annexed were granted, and sustaining the appeal of Lydia Taylor, mother of said deceased, from the decree of the register.

The material facts of the case were as follows :—

George Williams Taylor died at his residence in the city of Philadelphia, on or about the 9th day of March, A. D. 1859. He left surviving him a widow, Anna Taylor, the appellant, and a mother, Lydia Taylor, the appellee, but no children. His death occurred after a short illness. All his estate was personalty, consisting chiefly, if not entirely, of bequests made by his uncle, George Williams, deceased, the larger part of which has not yet been realized. On the 27th of February, A. D. 1861, application was made to the register of wills by Anna Taylor, the widow, to admit to probate a nuncupative will of said decedent. This

application was resisted by Lydia Taylor the mother, the alleged will giving all the property of the decedent to the widow, and the mother, under the intestate laws of this Commonwealth, being entitled to receive one-half of it. After the taking of testimony and hearing the arguments of counsel, the register, on the 25th of June 1861, made a formal decree admitting the said nuncupative will to probate, and declaring that the same substantially in these words: " I leave all that I possess in the world to my wife, Anna Taylor," was duly made on the 9th day of March ·1861, and that it had been duly proven according to law. On the 10th day of November 1863, Lydia Taylor, the mother, appealed from the decision of the register to the Register's Court. On the 23d day of the same month, the Register's Court, after argument by counsel upon the testimony as taken before the register, made its decision reversing the decree of the register, by which the said will was admitted to probate, and sustaining the appeal of Lydia Taylor. From this decision of the Register's Court the present appeal was taken.

The testimony in the case was as follows —

Mary McCaffrey, sworn.—"I was a servant of Mr. George Williams Taylor, deceased; had been living four months in his house before his death; had worked for him before I lived in the house; he was keeping house at Fifth and Appletree alley; he died in his home; I was present at the time of his death; he died in this house where he had been living; he called Mrs. Taylor to the bedside; took her hand in his, and said she was a good wife to him, but he was a bad husband to her; and then he said all he possessed in this world he would leave to her; he said to me, 'Mary, do you hear that?' I said, 'Yes, Mr. Taylor.' He turned round to Mr. Peacock, and asked Mr. Peacock if he heard it. Mr. Peacock said, 'Yes, George, I have often heard you say so." He was sick about two weeks, but we did not expect his death, because he was often sick in the same way. He had a physician, but not for the two weeks. The doctor was called the day before his death; it was Dr. Course. He died about 12 o'clock in the day. When he died, nothing had been said about a will before, to my knowledge. His death was very unexpected to me, and to the family. This complaint of his was a customary one, and usually took him ten or twelve days to recover from these attacks. There was nothing in this last attack that led me to suppose it was in any way different from those he was subject to. The day he called his wife to his bedside, and had the conversation with her in the presence of Mr. Peacock and myself, was on the day he died, about 11 o'clock, about an hour before he died. I was in the room with him after that. After that conversation he seemed weak and languid. He conversed after that with his wife; I was bathing his head; he told his wife where

[Taylor's Appeal.]

he would like to be buried, and what undertaker to have. He said some other things, but I could not understand, because he was choking like."

Cross-examined.—"The cause of his choking was the last of his life. He was dying. He retained his senses until within a few minutes of his death. I was in the room from the time he made this declaration until he died. There was an old lady in part of the time, Miss Hetty Williams, his aunt. She was in and out after this declaration was made. Mrs. Taylor and Mr. Peacock were also there. Mr. Peacock was in and out from the time this declaration occurred until he did. When he said these words to Mrs. Taylor, I thought for the first time that he was going to die. He complained of being weak; don't remember of his saying anything about pain. The physician was sent for, and came twice before his death; he was sent for the day before, he came about 8 o'clock of the morning he died, and did not come again, nor was he sent for, that I know of, until he died. I did not hear Mr. Taylor say anything about a will at all, only what I have before repeated. This choking I speak of occurred only a few minutes before he died. Up to that time he laid quietly on his bed, talking to his wife. She was in and out of the room; she couldn't stay there and see him, he was so weak at the moment of his death. Mr. Peacock and myself were in the room. I think Mrs. Taylor was out in the kitchen. He appeared to know us all until a few minutes of his death. Mr. Peacock had been living in the family some time. I found him in the family before I came. No one told Mr. Taylor that he was going to die, that I know of. The words that I have repeated here are the words he gave. I could never forget them words. Can't say whether Miss Hetty Williams was in the room when he spoke these words; she was in and out all the time.

"At the time this declaration was made, I had no idea he was going to die in an hour. That was the first time that it crossed my mind that he was going to die; but I had no idea that it would be in an hour or that day; none of the family expected his death so sudden; they said nothing, but they all seemed surprised that he died. There was nothing said in my presence about sending for somebody to write his will. They had pen, ink, and paper about the house. When the death-rattle occurred, we were all surprised that it had taken place so soon. Mr. Peacock appeared to be an intimate friend of the family."

Re-examined.—"Mr. Taylor was not strong enough to take a pen in his hand and write, when he made this declaration; he was raised in bed by pillows; he did not move his head in bed, more than to turn from me to Mr. Peacock."

Re-cross-examined.—"He reached out his hand to Mrs. Taylor, when she came to the bedside, and took her by the hand.

11 Wr.—3

She was in the room, but not at the bedside, when he called her to him. When he had these sicknesses he could never write. I have seen him try; he couldn't hold a pen, his hand shook so. I don't mean he had not strength to raise his hand, but that his hand shook; he was in entire possession of his senses, knew us all, and knew what he was about, and continued so until a short time before he died."

James H. Peacock, sworn.—"I was acquainted with George W. Taylor, deceased; became acquainted with him in 1836; that acquaintance continued until his death. I was present and know the facts connected with his death. He died at the corner of Fifth street and Appletree alley, at his own residence, where he had resided a year or more previously. About an hour and a half he took his wife by the hand and said to her, 'I have been a bad husband to you, and you have been a good wife to me, but I hope you will forgive me. All that I possess in the world I leave to you.' Then he called me up and said, 'Jimmy, did you hear that?' He likewise spoke to his servant Mary, and asked her to bear witness to it also. I left then to go for a physician. I found he was getting worse after I got back from the doctor's (I did not find the doctor home). I found him in a dying state; he died with his hand in mine. To the best of my belief, he died in an hour and a half after he had made this declaration. He begged to be buried at Laurel Hill. That wish was complied with. Mrs. Taylor and I went out and selected a lot, and got a deed for it. I did not reduce the substance of this will to writing at the time. Two days after his death I wrote a letter to Mr. Alexander Jeudon, who was a friend of Mr. Taylor's, acquainting him of his death, and the disposition of his property. That letter is either mislaid or destroyed; it was sent. I also wrote a part of a letter to Mr. William Seaton, New York, but was interrupted during the time that I was writing, and it was neither finished nor sent. That portion of the letter I found among some papers that I had taken from this city to Bath, Long Island. (Letter shown witness.) That is the letter of which I speak. (Letter marked A, and hereto annexed.) It was written on the day it bears date. Mr. Jeudon lived, at the time I wrote him, in New York, French's hotel. He lives now at the Globe hotel, New York. Mr. Taylor's death was sudden and unexpected on the part of his friends. It was only about the time he made that declaration that any one thought he would die. He had told his wife and myself that he had made a written will, and that the draft of it was in the hands of Morgan Hinchman, and that he had left everything to his wife in that will. He did not mention that will at the time he was dying. After his death I made the inquiry of Morgan Hinchman. He informed me that no will had been executed by him."

Cross-examined.—"I have every reason to believe that Mr. Taylor, at the time he made this declaration, was in the perfect possession of his senses, but weak. When he spoke to the servant girl he said, 'Mary, did you hear that?' The only persons in the room at that time were the deceased, his wife,.Mary, and myself. Miss Hetty Williams may have been there also, but I don't recollect the fact. At the time he made this declaration, I thought he would die very soon. That was the reason I ran for the doctor. The doctor had been there but two hours before. I didn't hear him say anything that day about a will, any further than I have mentioned. He didn't request me to reduce what he had said to writing. Within a month before his death I had heard him say that he had made his will, and left all to his wife. He mentioned it also afterwards, during the time he was in bed during his last sickness."

James M. Course, M. D., affirmed.—"I was acquainted with George Williams Taylor, deceased; was his physician for some years past. I attended him in his last illness. He died in Fifth street, corner of Appletree alley, at his own residence. I was not present at the time he died; I got there a few minutes after his death. He died near noon on 9th day of March 1859. I had visited him several times the morning before he died. He died unexpectedly to me. I have had many patients similarly situated, and whose habits were similar to his, who have recovered. I told Mr. Williams and his wife that morning that I did not think he would die, although he was in a dangerous state. He seemed to be entirely sound in his mind that day. He asked me that morning my opinion of the state of his health, and I told him I did not think he would die, that I thought I could bring him out; but I told him that his habits were adverse to health or long life. He must have sunk very rapidly. I was sent for, but was out. I reached his bedside near noon, when he was dead. He had apparently died a few minutes before. His wife was present, and I think Mr. Peacock was there. I remember distinctly that he was. I think there were others there, but can't say positively. The subject of conversation was his sudden death. I expressed my surprise at it."

Cross-examined.—"My office was between four and five squares from Mr. Taylor's house. My impression is, I saw him early in the morning, and again at 9 o'clock. His mind was perfectly clear and sound. He talked to me rationally upon various subjects."

Charles A. Brown, affirmed.—"I am acquainted with the handwriting of Mr. Peacock; have seen it frequently. (Exhibit A shown witness.) That is Mr. Peacock's writing, to the best of my knowledge."

Admitted that, at the request of Mrs. Taylor, letters of ad-

ministration on the estate of deceased in October 1859, were granted to Passmore Williamson.

## " EXHIBIT A.

" Philadelphia, 11th March 1859.

" Mr. William Seaton,—Dear Sir : The cause of my staying in this city is now over. My friend, George W. Taylor, is dead. He died the day before yesterday, about 12 o'clock, leaving his property to his wife, there being no children. I must confess I was somewhat surprised at the violence of the grief displayed by Mrs. Taylor, as he had been a very indifferent husband to her ; but there is no accounting for the actions of the human heart, and no doubt she was sincere."

The Register's Court was composed of Judges Allison and Ludlow and the Register of Wills. No written opinion was delivered, but the appeal of Mrs. Lydia Taylor was sustained, and the decree of the late register reversed; which was the error assigned.

*H. R. Warriner*, for appellant.

*George Junkin, Jr.*, for appellee.

The opinion of the court was delivered, March 21st 1864, by

THOMPSON, J.—This is an attempt to set up an alleged nuncupative last will of George Williams Taylor, late of this city, deceased. After his death, in 1859, administration on his estate, at the request of his widow, was granted to Passmore Williamson, Esq., who settled up the same, and filed his account. Then the widow, nearly two years after her husband's death, essayed to establish a nuncupative will, under which she would be the sole legatee of his property. The register certified the will as proved; but on appeal to the Register's Court, the decree of the register was overruled, and this appeal taken.

Wills of this description are not favourites of the law, and are only allowed in the extremity of the testator's last sickness, and when it has been so sudden, unexpected, and violent as to prevent him from putting his testamentary wishes into writing (6 W. & S. 188), all the requisites of the law for the establishment of such wills must be strictly complied with : 4 Rawle 46. One of them is, that the testimony, or the substance thereof, must be committed to writing within six days after the making of such will. Neither the words nor the substance of them, as used by the alleged testator, were ever committed to writing in this case as proof of a bequest, or to be preserved as such by any one. The letter written by Mr. Peacock to Mr. Jeudon did not purport to do more than to inform the latter of Taylor's death, and

in a general way of the disposition of his property; but how, or in what manner, was not stated. Nor was even that letter produced, or shown to have been lost or destroyed. The same thing must be said of the fragment of an unsigned letter written by the same witness two days after Taylor's death. It contains nothing of what the statute requires. It sets forth no words of a testamentary kind to show the *animus testandi*, nor the disposition of his property. It is only the assertion of the writer, that he left his property to his wife. This is the writer's will, not the testator's. The law requires the words of the testator, or their substance, so that from them the testamentary disposition may appear. So, in committing to writing a nuncupative will, other facts should be stated in addition to the testamentary words, or their substance; such as his request to the bystander to bear witness that the words used are his will. Nothing of this was done. The proof was therefore entirely insufficient, and the Register's Court were right in overruling the probate by the register.

Decree of the Register's Court affirmed, at the costs of the appellant.

AGNEW, J., was absent at Nisi Prius when this case was argued.