## McClellan's Estate.

Argued May 26, 1936; reargued September 30, 1936. Before KEPHART, C. J., SCHAFFER, MAXEY, DREW, LINN, STERN and BARNES, JJ.

*Albert C. Hirsch,* with him *Cresswell S. Shumaker, Watson & Freeman, O. K. Eaton* and *Jason Richardson,* for appellants.

*D. M. Anderson,* with him *Guy B. Hoge* and *John R. McCreight,* for appellees.

OPINION BY MR. JUSTICE BARNES, January 11, 1937:
The question here involved is whether the decedent made a valid nuncupative will.[1]

---

[1] Section 4 of The Wills Act of June 7, 1917, P. L. 403, 405, provides as follows:

"Personal estate may be bequeathed by a nuncupative will under the following restrictions:

"(a) Such will shall in all cases be made during the last sickness of the testator, and in the house of his habitation or dwelling, or where he has resided for the space of ten days or more next before the making of such will, except where such person shall be surprised by sickness, being from his own house.

"(b) Where the sum or value bequeathed shall exceed one hundred dollars, it shall be proved that the testator, at the time of pronouncing the bequest, did bid the persons present, or some of them, to bear witness that such was his will, or to that effect; and, in all cases the foregoing requisites shall be proved by two or more witnesses who were present at the making of such will.

"(c) No testimony shall be received to prove any nuncupative will after six months elapsed from the speaking of the alleged testamentary words, unless the said testimony, or the substance thereof, were committed to writing within six days after the making of said will."

Ethel May McClellan, an unmarried woman, thirty-three years of age, died on February 27, 1935, possessed of an estate consisting entirely of personalty valued approximately at $49,000. Her nearest and only surviving relatives were two maternal aunts and an uncle.

According to the evidence, she became ill at her home in Mt. Lebanon, Allegheny County, on February 9, 1935. At first she suffered from influenza, but when her physician was called on February 12th, he diagnosed her illness on that date as acute hemorrhagic nephritis. At the direction of the physician she was removed on February 22nd to the South Side Hospital in Pittsburgh, where her condition grew worse, due to the development of encephalitis, or inflammation of the brain. She was delirious and incoherent on February 24th, and the possibility of death was so near that her relatives were summoned. She died in the hospital on the morning of February 27th, 1935.

While at the hospital there was one period during which the decedent rallied and showed an improvement in her condition. This was on the morning of February 25th, when for nearly three hours, lasting until noon, she became rational and her speech was coherent. The doctor visited her at ten o'clock on that morning, and remained about twenty-five minutes. Soon after he left, Mrs. Daugherty, a close friend of Miss McClellan, and one of the appellants in this case, came into the room. A nurse, Miss Brinkman, was also in the room. After exchanging greetings, Mrs. Daugherty spoke of a ring belonging to Miss McClellan, which she had in her possession, and asked her what she desired her to do with it. Decedent gave instructions for the disposition of the ring, "when I am gone," and then said that there were other things, some money, several mortgages, and an interest in a trust fund that she would like to take care of now. Miss Brinkman thereupon asked her if she were trying to make a will, to which decedent replied, "Yes, while I can remember

these things." When questioned whether she had already made a will she answered, "No," that she did not think she would get well, that she was afraid it was too late—"I can't write." During this conversation, the nurse, apparently of her own volition, made upon a small sheet of paper a notation of decedent's directions concerning the stones in the ring.

Before she had proceeded further than to dispose of the ring, Miss Brinkman suggested that she would get another witness. The nurse then called an interne of the hospital, Dr. Stiller, who came into the room and read what the nurse had written concerning the disposition of the ring. Decedent continued to relate to those present, Miss Brinkman, Mrs. Daugherty and Dr. Stiller, what she wanted done with her estate. She named each item and each beneficiary. Included among the gifts were certain stocks, a $25,000 trust fund, three mortgages and various articles of furniture. Referring to the three mortgages, she spelled the names of the mortgagors to indicate the particular mortgage she wished to be given to a designated beneficiary. As decedent expressed her wishes the nurse continued to write down on the paper the items and the names of the beneficiaries. It required approximately an hour for decedent to give these directions for the disposal of her property.[2]

Mrs. Daugherty having left the room, Dr. Stiller, in the presence of the nurse, repeated to decedent the items which were contained in the nurse's memoran-

---

[2] The following are typical of the nurse's notations:

"Homewood Cemetery in double crypt Sally—To be taken from office insurance.

Ring—Big centre stone, Eliz McClellan
Small stones—Kate
Western Public Stock—Kate
Lone Star Stock—Kate
About $25,000 in Dads trust

Half to Aunt Elf  } Dads wish
  "  to Sally     }

dum and asked her if she were satisfied with this disposition of her estate, to which she replied, "I have given, told you what I want done with my belongings; I am tired; let me alone." She then became exhausted and fell asleep, before the doctor completed the taking of a blood count. From this time until her death at ten o'clock on the morning of February 27th, two days later, the evidence shows that decedent was either delirious or in a coma most of the time.

Upon petition, answer, and after testimony was taken, the register of wills admitted to probate the alleged nuncupative will of decedent. Thereafter, on appeal from the register, the court below held there was not sufficient compliance with the requirements of the Wills Act, and declared the will invalid. Exceptions to the decree setting aside the probate were dismissed by the court in banc, and from the decree accordingly entered these appeals are taken by two of the beneficiaries under the alleged will.

The testamentary capacity of this decedent is not in dispute. The sole question for us to decide is whether the nuncupative will here set up complies with the requirements of the Wills Act.

In considering the oral declarations of a decedent made with dispositive intent during a last illness, which are thereafter sought to be probated as a last will and testament of personal property, we are faced with conditions imposed by statute, a strict compliance with which is necessary in order to entitle such will to the sanction of probate. From an early day our courts have held consistently that the absence of a rigid observance of these statutory requirements is necessarily fatal to the validity of such an instrument. In their essence, these restrictions are not merely arbitrary rules of law. They have their foundation in the depths of experience, and are regarded as fundamentally essential to safeguard the estates of deceased persons against fraud and perjury in setting up death-bed wills of this

nature. For that reason often it has been repeated, in the cases dealing with the subject, that unwritten or nuncupative wills, though tolerated, are by no means favorites of the law: *Yarnall's Will,* 4 Rawle 45; *Boyer v. Frick,* 4 W. & S. 357; *Porter's Appeal,* 10 Pa. 254; *Taylor's Appeal,* 47 Pa. 31; *Rutt's Estate,* 200 Pa. 549; *Megary's Estate,* 25 Pa. Superior Ct. 243; Schouler on Wills, 6th Ed., Vol. 1, p. 533.

This Court many years ago in *Werkheiser v. Werkheiser,* 6 W. & S. 184, stated the rule which still holds true today, that "every one who undertakes to make a testamentary disposition of his property, must conform to the law regulating such disposition; and if he does not care to do so, the law cannot uphold it. Now the Act of Assembly requires that all wills shall be in writing, signed by the testator, and permits a verbal or nuncupative will only in extreme cases, where the party by the effect of disease is incapacitated from making a written will. To sanction a verbal will, where there is time to make a written one, would tend to the introduction of all the doubt, uncertainty, litigation, fraud and imposition which uniform experience has shown attend the allowance of verbal wills in ordinary cases."

It is a basic requirement of a nuncupative will that it be made during the last sickness of the testator.[3] The decisions of this Court have uniformly construed this provision to require that the nuncupation take place in such *extremity* of the testator's last sickness

---

[3] Section 4 of the Wills Act of 1917 (Clauses A and B thereof) is derived from Section 7 of the Act of April 8, 1833, P. L. 249; the section mentioned in the Act of 1833 was taken from Section 3 of the Act of 1705, 1 Sm. L. 33, the provisions of which originated in the English Statute of Frauds, 29 Car. II, Chap. 3, Sec. 5. Some changes were made in the language of the statute, as it was carried into subsequent legislation, but the provisions remained substantially the same.

Clause C of the said Act of 1917 is Section 11 of the Act of March 15, 1832, P. L. 135, which was taken from Section 4 of the Act of 1705, with merely verbal changes.

as to preclude the making of a written will.  This means
that his last sickness has come upon him so *suddenly
and unexpectedly* that he has not time or opportunity
to have his testamentary wishes reduced to writing.
The general rule requiring all wills to be in writing is
intended to be as nearly universal as is possible, and
nuncupation is not a matter of right, but of special
indulgence as a last resort.  It has no justification in
law except the necessity arising from the extreme ill-
ness of the testator: *Yarnall's Will,* supra; *Boyer v.
Frick,* supra; *Taylor's App,* supra; *Haus v. Palmer,*
21 Pa. 296; *Rutt's Est.,* supra; *Munhall's Est.,* 234
Pa. 169; *Shover's Est.,* 258 Pa. 70.  These principles
have become so firmly established by statute and by the
decisions of this court that the only question which can
possibly arise concerns their application to the particu-
lar case.

Here, according to the evidence, decedent was not
attacked by a sudden and fatal illness which prevented
her from making a written will.  It appears that she
was first taken ill on February 9th, eighteen days be-
fore her demise, and her condition grew progressively
worse until her removal to the hospital on February
22nd.  During at least a part of this time, although
seriously ill, she was of sound mind and competent to
dispose of her estate.  There was sufficient opportunity
for her to have made a written will, as there is no evi-
dence that she was so incapacitated by disease during
this entire interval to have been unable to do so.  Igno-
rance on her part that a written will was necessary, or
carelessness in attending to it, or mere aversion to be
troubled about it, does not constitute such necessity
as to make possible the substitution of an oral for a writ-
ten one: *Haus v. Palmer,* supra; *Rutt's Est.,* supra.

Assume, however, that owing to oversight or neglect
upon her part, the subject of a will first occurred to
her on the morning of February 25th, when she made
the oral declarations for the disposition of her prop-

erty. Even then, it would appear that, within the time that was required for her to express her wishes, for the nurse to prepare the memorandum, and for the interne to verify with decedent the items thereon, a written will could have been prepared and signed by decedent, either personally, or by her mark. Considering all the facts before us, the extremity of the last sickness of a testator which validates nuncupation in a proper case is lacking in the present one.

The foregoing is the view which this Court has adopted in the cases bearing upon this question. In *Boyer v. Frick,* supra, the decedent was taken ill on Monday, May 23, 1842; two days later, before a surgical operation, she made a statement to relatives directing the disposition of her estate. Subsequently the operation was performed, and her death resulted on the fifth day after her illness. Mr. Chief Justice GIBSON said (p. 361) : "It would have taken very little more time to write down the testamentary direction she committed to the witnesses to turn the property into cash, and divide it after payment of debts among Frick's children, than it would have taken to have the paper signed with her name by her own hand, or by the hand of another in her presence, had it been written already. All this she was bodily and mentally able to do; and why was it not done? . . . The declaration of her will was made at eight o'clock in the morning, and the operation was delayed until noon; so that there was an interval of four hours, during which she had the entire use of her faculties, and which was sufficient for a more complicated arrangement than the one she attempted."

In *Rutt's Estate,* supra, it appears that testator had been sick for nine days. He was in full possession of his faculties during this time. On the afternoon of March 7, 1900, he is alleged to have made a nuncupative will. He died later that day. In an opinion of the court below, which was adopted by this Court, it is said, (p. 556) : "It is just such a case as this that the

law has attempted to guard against. The decedent was not attacked by sudden and fatal illness; but, for nine days, had been suffering from the effects of his injury, all of which time he was in perfect mind and competent to dispose of his estate . . . It makes no difference that he actually died within three or four hours of that time, for it is not the sudden demise that makes all expressions immediately preceding it liable to be construed as a nuncupative will, but only those as shall be made by him when overtaken by sudden and violent illness and he has not time nor opportunity to make a written will . . ."

We held in *Shover's Estate*, supra, (p. 71) : "A nuncupative will can be sustained only when made during the last sickness of the testator, and in such extremity thereof as precludes a written will." In this case, testatrix, suffering from blood poisoning, was confined to her bed on July 13, 1915, and made a parol testamentary disposition of her estate on July 19th. She died on July 25th, 1915. We said (p. 71) : "The Orphans' Court found on abundant evidence that Mrs. Shover could have made a written will when she made the alleged oral will and for at least thirty-six hours thereafter, that is, up until Tuesday evening . . . True, she was suffering and her arms and hands were badly swollen from the effects of the blood poisoning, but she was just as capable of dictating a written as an unwritten will and had ample time to do so . . . Under such circumstances it is vain to argue that she was precluded from making a written will by the extremity of her last sickness."

Turning again to the facts of the case, it is doubtful whether decedent made a distinct and explicit request to the persons who were present to bear witness that she was declaring her will. She did not of her own initiative call upon the nurse to listen to her words as being her will. Rather, decedent's desire to make a will became apparent only by reason of her affirmative

answers to the nurse's questioning. The rogatio testium, or the calling upon the persons present to bear witness that such was her will,—a vital requisite—must be a voluntary declaration or expression by the decedent, and it cannot be established through words drawn from testatrix as the result of continued questioning: *Rutt's Est.,* supra, (p. 553). And it was the nurse who called the interne, Dr. Stiller, to bear witness to the words of decedent as constituting her will, and not the decedent herself. Not only did the nurse take the initiative and of her own accord ask Dr. Stiller to come into the room and act as a witness, but it nowhere appears that decedent said anything to him which might be construed as a request that he bear witness to her will. As Mr. Justice MITCHELL, speaking for this Court, stated in *Wiley's Est.,* 187 Pa. 82, (p. 86): "There must not only be the testator's intent to make a will then and there, but an explicit call on persons present to bear witness that such was the intended effect of the testator's declaration . . . The phrase 'or to that effect' was intended to prevent the inference that any set form of words should be necessary, but not to diminish the requirement of a *distinct and explicit request* by the testator to persons present to remember and be ready to testify that the testator was thereby making his will."

Whether, as it is argued, the nurse's memorandum constituted a will, which the decedent failed to execute or to have executed by someone for her, is left in doubt by the proofs. While there is nothing to show that decedent requested the nurse to make notations of what she said, the fact that she spelled out the names of certain of the mortgagors, and that the interne "went over" the memorandum with her, gives rise to a strong inference that she knew her words were written down. However it does not appear that decedent thought a writing was being prepared which she was to sign. It seems to us there was no convincing proof of an intention of decedent to make a written will.

For the reasons stated, the majority of this Court is of opinion that the statutory requirements for a valid nuncupative will have not been met in the present case, and that the court below properly vacated the decree of the register of wills admitting the alleged will to probate.

The order of the court below is affirmed, costs to be paid by the estate.